**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 6, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1036**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020FA253

**IN COURT OF APPEALS
DISTRICT III**

IN RE THE MARRIAGE OF:

AMITY BETH PEET,

    PETITIONER-RESPONDENT,

  V.

STEVEN MICHAEL PEET,

    RESPONDENT-APPELLANT.

APPEAL from a judgment of the circuit court for Barron County: MAUREEN D. BOYLE, Judge. *Affirmed in part; reversed in part and cause remanded with directions*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Steven Peet appeals from a judgment of divorce, challenging the circuit court's award of maintenance to his former wife, Amity Peet, and the court's division of the parties' property.[1] We reject each of Steven's arguments regarding maintenance. We also reject Steven's argument that the court erred by awarding certain items of personal property to Steven at their purchase prices, rather than at their fair market values. We conclude, however, that the court erroneously exercised its discretion when assigning a value to Steven's premarital interest in the land where the parties' residence is located.

¶2 We therefore affirm the circuit court's judgment as to maintenance, but we reverse that portion of the judgment pertaining to the property division. We remand for the court to reconsider the value of Steven's premarital interest in the land where the parties' residence is located and to adjust its division of the parties' property accordingly.

## BACKGROUND

¶3 The parties were married in October 2002, and Amity filed for divorce in December 2020. At the time of filing, Amity was forty-five years old, and Steven was fifty-eight. The parties had one child together, who was over eighteen at the time of filing.

¶4 The circuit court held a contested divorce hearing on January 7 and February 3, 2022. Following an oral ruling in March 2022, the court issued its "Findings of Fact, Conclusions of Law, and Judgment of Divorce." The court

---

[1] Because the parties share a surname, we refer to them by their first names throughout the remainder of this opinion.

found that Amity had an "annual earning capacity" of $26,832, "based upon [her] earning $13.00 per hour and working 40 hours per week." The court found that Steven had "annual earnings" of $45,408, "based upon [him earning] $22.00 per hour and working 40 hours per week." After considering the factors set forth in WIS. STAT. § 767.56 (2021-22),[2] the court ordered Steven to pay Amity $550 per month in maintenance, for a period of five years. The court divided the parties' property equally after crediting Steven $17,000 for his premarital interest in the land on which the parties' residence was located, and it ordered Steven to make an equalization payment of $67,729.10 to Amity.

¶5      Steven now appeals, arguing that the circuit court erred in various ways with respect to maintenance and the division of the parties' property. Additional facts are included below as relevant to Steven's arguments.[3]

## DISCUSSION

¶6      The division of property at divorce and the determination of maintenance are entrusted to the circuit court's discretion, and we will not disturb a court's decisions on these issues unless the court erroneously exercised its discretion. *LeMere v. LeMere*, 2003 WI 67, ¶13, 262 Wis. 2d 426, 663 N.W.2d 789. A court properly exercises its discretion when it examines the relevant facts,

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[3] Amity did not file a brief in this appeal. Although this court may summarily reverse a circuit court's decision based on the respondent's failure to file a brief, *see* WIS. STAT. RULE 809.83(2), we decline to do so here, as the record provides support for all but one of the circuit court's challenged rulings.

applies a proper standard of law, and uses a demonstrated rational process to reach a reasonable conclusion. *Id.*

¶7    Our review of a circuit court's discretionary decisions may involve underlying questions of law and fact. *See **Covelli v. Covelli***, 2006 WI App 121, ¶13, 293 Wis. 2d 707, 718 N.W.2d 260. We review any questions of law independently, but we will not disturb the circuit court's factual findings unless they are clearly erroneous. *See id.* "Although the proper exercise of discretion contemplates that the circuit court explain its reasoning, when the court does not do so, we may search the record to determine if it supports the court's discretionary decision." ***Randall v. Randall***, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737.

## I. Maintenance

### A. *Amity's income*

¶8    Steven first argues that when calculating maintenance, the circuit court erred by assigning an "earning capacity" to Amity that was less than her actual income. Steven argues that a court may consider a party's earning capacity, rather than the party's actual income, only when it determines that the party is shirking. *See **Chen v. Warner***, 2005 WI 55, ¶20, 280 Wis. 2d 344, 695 N.W.2d 758 (explaining that, when calculating child support, a circuit court "would consider a parent's earning capacity rather than the parent's actual earnings only if it has concluded that the parent has been 'shirking[]'"); *see also **Scheuer v. Scheuer***, 2006 WI App 38, ¶¶8-9, 290 Wis. 2d 250, 711 N.W.2d 698 (applying a shirking analysis in the context of a maintenance award). Because the court did not make a finding of shirking in this case, Steven contends that the court was

required to use Amity's actual income when calculating maintenance, rather than her earning capacity.

¶9     Although the circuit court used the term "earning capacity" in its oral ruling and written decision, our review of the record indicates that the court did not actually consider Amity's earning capacity when calculating maintenance. Instead, it appears from the record that the court attempted to estimate Amity's actual income at the time of divorce, to the best of its ability, based on the limited evidence that the parties' provided.

¶10     At the contested divorce hearing, Amity testified to working at a number of low-wage, part-time jobs throughout the parties' marriage. She also testified that, for at least some period of time, she did not work and instead stayed home with the parties' son. On the whole, Amity's past employment history was sporadic and did not provide a clear picture of her income over time. Although Steven's expert witness opined that Amity had the ability to earn between $27,040 and $35,360 per year, assuming a forty-hour work week, the circuit court found that witness's testimony to be "incredibly biased and really not helpful." "When the [circuit] court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and of the weight to be given to each witness's testimony." *Lessor v. Wangelin*, 221 Wis. 2d 659, 665, 586 N.W.2d 1 (Ct. App. 1998).

¶11     Amity testified that at the time of the contested hearing, she was working part-time at Premium Retail, earning $13 per hour. Amity testified that she typically worked about twelve hours per week for Premium Retail, but "[i]t can be more." Amity also testified that she was working part-time for Barron County Developmental Services (BCDS), with somewhat variable hours, making

$12.50 per hour. Amity explained that she had recently accepted a full-time position with BCDS, but she did not know when she would begin her full-time employment. She anticipated working thirty-five hours per week in that position, with the possibility for additional hours. She also testified that she anticipated continuing her part-time work at Premium Retail after she began her full-time position with BCDS.

¶12 Based on this evidence, the circuit court estimated that Amity's annual income would be $26,832, using an hourly wage of $13 and assuming that Amity would work forty hours per week. This estimation of Amity's income was reasonable, given Amity's testimony that she was currently employed at jobs that paid $12.50 and $13 per hour, respectively, and that she anticipated beginning full-time employment with BCDS at some point in the near future.

¶13 Steven argues that the circuit court erred because Amity's monthly income from Premium Retail at the time of the contested hearing was $670.80 (based on twelve hours of work per week), and Amity anticipated earning monthly income of $1,881.25 from BCDS (based on thirty-five hours of work per week). Adding those amounts together, Steven argues that Amity's actual income at the time of the contested hearing was $2,552.05 per month, or $30,624.60 per year.

¶14 Steven has failed to show that the circuit court erroneously exercised its discretion by estimating Amity's annual income at $26,832. Notably, while Amity testified that she had recently accepted a full-time position with BCDS, she had not yet started that position, and she could not say exactly how many hours she would be working or what her hourly wage would be. Furthermore, Steven's calculation of $30,624.60 is based on the assumption that, once Amity began her full-time position at BCDS, she would continue working twelve hours per week at

Premium Retail and would therefore work a total of forty-seven hours per week. Although Amity testified that she intended to continue working part-time at Premium Retail after she began her full-time employment with BCDS, she explained that she sometimes worked only eight hours per week at Premium Retail. Thus, it is not clear that Amity would have consistently worked forty-seven hours per week after beginning her full-time job at BCDS.

¶15 In any event, it would not have been unreasonable for the circuit court to conclude that once Amity actually began her full-time job at BCDS, she might not want to—or have the time to—continue her part-time employment at Premium Retail. Moreover, given that the court determined Steven's income based on a projected forty-hour work week, the court could reasonably conclude that it would be unfair to base Amity's income on the assumption that she would work forty-seven hours per week. On these facts, the court's estimation of Amity's actual income at $26,832—using an hourly wage of $13 and a forty-hour work week—was not an erroneous exercise of discretion.

### B. Steven's income

¶16 Steven next argues that the circuit court erred by assigning an income to him that is not supported by the record. At the contested divorce hearing, Steven testified that he was self-employed as an HVAC contractor and that his business was a sole proprietorship. He submitted a financial disclosure statement asserting that his income was $2,700 per month, or $32,400 per year. Rather than accepting that amount and using it to calculate Steven's maintenance obligation, the court determined that Steven's annual income was $45,408, based on an hourly wage of $22 and the assumption that Steven would work forty hours per week. Steven contends that the court erroneously exercised its discretion by

"disregard[ing] and ignor[ing]" the income stated on his financial disclosure statement and "fabricat[ing]" an annual income for him based on an "assumed" hourly wage.

¶17    Steven emphasizes that the circuit court never found that the monthly income reported on his financial disclosure statement was inaccurate. It is clear, however, that the court made an implicit finding in that regard. An implicit finding of fact is sufficient when the facts of record support the circuit court's decision. *State v. Echols*, 175 Wis. 2d 653, 672, 499 N.W.2d 631 (1993).

¶18    Here, the evidence supports the circuit court's implicit finding that the income reported on Steven's financial disclosure statement was inaccurate. Steven did not produce any documentary evidence to support his claim that he made only $2,700 per month. In addition, he testified that the $2,700 figure was only an average—some months he makes less than $2,700, and other months he makes more. Steven further explained that instead of paying himself a salary from his business, he simply takes whatever money is leftover after the business's expenses are paid. When asked what documents he had reviewed to arrive at the $2,700 figure, Steven responded, "What's been billed and what's been paid. And expenses to that point."

¶19    Steven also introduced copies of his income tax returns from 2020, 2019, and 2018. The tax returns showed that Steven's business had gross income of $570,767 in 2020, $587,676 in 2019, and $548,120 in 2018. However, the 2020 return listed Steven's income as only $10,060, which Steven testified was his business's "net profit" during that year. Steven's income was listed as $22,752 on the 2019 return and $21,500 on the 2018 return. Steven testified that his business pays various expenses for him, including a fuel bill, health insurance, business

insurance, truck insurance, his cell phone bill, a portion of his utilities, a portion of his real estate taxes,[4] and his vehicle registration. Steven's tax returns reflected that he was able to utilize tax deductions for some of those expenses.

¶20 Based on this evidence, the circuit court could reasonably find that the income reported on Steven's financial disclosure statement did not accurately reflect his actual earnings. In its oral ruling, the court noted that Steven's business "covers some of his [personal] expenses and he deducts those expenses; so while they may be expenses for him they are deductible expenses. And so they're not the same thing as expenses he gets to apply that against the income he receives from the business." The court then noted that Steven's "hourly rate" was not clear from the record and commented, "It's surprising he doesn't apparently charge an hourly rate, but that would have been helpful to know."

¶21 The circuit court next observed that Steven's tax returns reflected that his business's sales were "fairly significant," in that they were consistently over $500,000 per year. While the court acknowledged that the business also had a "significant amount of expenses," the court emphasized that Steven "has expenses related to the home, the cars, the insurance, things that are actually deductible here on the tax return that to some extent I think have to be included in his business income."

¶22 Given the dearth of information regarding Steven's "actual salary," the circuit court adopted Amity's attorney's suggestion to "utilize what [Steven] pays out for expenses in terms of generating an actual annual income for him."

---

[4] Steven explained that his business is located on the same property as his home, but in a separate building.

The court stated that, under the circumstances, "there's really no other way to calculate [Steven's income]."

¶23 Based on the amount of Steven's expenses, as reported on his financial disclosure statement, the circuit court determined it was reasonable to conclude that Steven was earning $22 per hour, which resulted in an annual income of $45,408, assuming a forty-hour work week. The court explained that in determining this amount,

> I gave him credit for the expenses that he would have to pay out of that hourly rate for his business. And looked at the expenses that he had every month, and came up with a rate of $22 an hour based on what the expenses were he had each month that he was covering.

The court further explained that Steven "doesn't separate out his expenses from his income. He doesn't have an accountant. There's no business appraisal. There's no way for me to figure this out because he is his business. And so I had to create a way to generate a number, and that's how I generated it."

¶24 The circuit court's determination of Steven's income was not an erroneous exercise of discretion, given the limited information regarding Steven's actual earnings. The court could reasonably reject the $2,700 figure reported on Steven's financial disclosure statement, as it was not supported by any documentary evidence or by a detailed explanation of how Steven arrived at that amount. In addition, accepting Steven's reported income of $2,700 per month would have meant that Steven was earning about $15 per hour—just $2 more per hour than the wage that the court attributed to Amity. The court could reasonably agree with Amity's attorney that, given Steven's experience in his trade, "$15 an hour … defies common sense." Furthermore, as Amity's attorney noted, if

Steven's income was actually as low as he reported on his financial disclosure statement, he would "likely qualify for BadgerCare."

¶25     The circuit court could also reasonably conclude that the income shown on Steven's tax returns did not accurately portray his earnings, given that the tax returns reflected even less income than Steven had reported on his financial disclosure statement.    Under these circumstances, the court could reasonably decide that the most accurate method of determining Steven's income would be to use the amount of his reported expenses to calculate an hourly wage, as Amity's attorney suggested.    The court's determination of Steven's income was based on the facts of record and was not unreasonable, given the limited information about Steven's actual earnings, the lack of documentation supporting his claimed monthly income, and Steven's testimony that his business paid some of his personal expenses.    We therefore reject Steven's argument that the court erroneously exercised its discretion when determining his income.

### C.  Financial benefit to Amity from cohabitation

¶26     Next, Steven argues that the circuit court erred by "failing to consider the financial benefit flowing to Amity from her cohabitation arrangement."    As noted above, the contested divorce hearing in this case took place over two days:  January 7 and February 3, 2022.  During the first day of the hearing on January 7, Amity testified that she was living with a significant other, who helped to pay some of her expenses, including the majority of her rent.

¶27     The parties did not finish presenting their evidence on January 7.  As a result, the circuit court and the parties agreed that the contested hearing would continue on February 3.  At the parties' request, the court granted the parties a

judgment of divorce at the end of the January 7 hearing but reserved ruling on the issues of property division and maintenance. Amity's attorney then stated:

> Your Honor, my only concern when we have these spillover hearings is that sometimes then parties go and try to gather new evidence or such. Given that the Court had a clear scheduling order my position would be that witnesses have already been disclosed, exhibits have already been disclosed. And so in that regard I don't anticipate new discovery between now and February. So with that caveat I have nothing else.

Steven's attorney agreed with Amity's counsel's position. The court then stated:

> Yeah, I agree as well. We technically should have finished today. Sometimes that does happen. And I agree … that we need to make that clear that things are what they are. And, of course, that doesn't mean if for some reason between now and February 3rd the parties reach an agreement that can certainly happen. But definitely discovery is closed. We're going to go with what we have here today. And I expect to hear, you know, more testimony from [Steven] yet and perhaps rebuttal testimony. So that certainly [will] be allowable.

¶28 Thereafter, during the second day of the contested hearing on February 3, Amity testified that she was no longer living with her significant other, who had "left" her the day after the January 7 hearing. Steven's attorney objected to this testimony, asserting it was "improper rebuttal" because it had "nothing to do with any testimony made by [Steven] or his witnesses." When Amity's attorney argued that this testimony was relevant to "the claims for maintenance," Steven's attorney responded, "Your Honor, but for not having enough time at the last hearing what she's talking about would not even be considered by the Court. And, again, I'll restate it's not proper rebuttal testimony."

¶29 The circuit court agreed with Steven's attorney that "had we completed the testimony related to property division and maintenance on January 7th I wouldn't even know about this." The court stated, however, that the testimony had not been completed on January 7, that the court still needed to make a determination regarding maintenance, and that Amity's testimony regarding the end of her cohabitation would "perhaps" be relevant to that issue. The court then noted, "[I]n other circumstances where there have been changes in circumstance from one hearing to the other … I've allowed parties to provide information related to finances." The court stated it was "going to think about this and figure out if I can rely on that additional information that's been presented today." Ultimately, the court did not return to this topic and did not make a formal ruling on Steven's objection.

¶30 During its subsequent oral ruling, the circuit court addressed each of the statutory factors that a court must consider when awarding maintenance. *See* WIS. STAT. § 767.56. Based on those factors, the court awarded Amity $550 per month in maintenance for a period of five years. In its discussion of maintenance, the court did not specifically address Amity's cohabitation with her significant other or indicate whether that fact had any bearing on the court's decision.

¶31 Steven contends that the circuit court erred because it was required to consider the financial benefit that Amity received as a result of her cohabitation arrangement. *See Woodard v. Woodard*, 2005 WI App 65, ¶10, 281 Wis. 2d 217, 696 N.W.2d 221 (holding that a court must consider "a financial benefit flowing from cohabitation" when awarding maintenance). Steven further asserts that the court could not consider Amity's testimony from the February 3 hearing that she was no longer living with her significant other because the court had ruled, at the

13

end of the January 7 hearing, that discovery was closed and that the parties would not be allowed to submit new evidence.

¶32     We conclude that Steven has forfeited his argument regarding the circuit court's failure to consider Amity's cohabitation arrangement. During its oral ruling, the court did not address Amity's cohabitation with her significant other in any way. Steven was therefore aware that the court had not considered that issue. At the end of its oral ruling, the court specifically asked the parties whether there were any other issues that needed to be addressed. Steven did not inform the court that it was required to consider Amity's cohabitation arrangement when awarding maintenance or that he believed the court had erred by failing to address that factor. Had Steven done so, the court could have corrected its alleged error at that point, obviating the need for us to consider this issue on appeal. Under these circumstances, we deem Steven to have forfeited his claim that the court erred by failing to consider Amity's cohabitation arrangement, and we do not address it further. *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited."); *Bishop v. City of Burlington*, 2001 WI App 154, ¶8, 246 Wis. 2d 879, 631 N.W.2d 656 ("A litigant must raise an issue with sufficient prominence such that the [circuit] court understands that it is being called upon to make a ruling.").

### D. Steven's ability to pay maintenance

¶33     Steven next argues that the circuit court erred by failing to consider his ability to pay maintenance. He relies on *Poindexter v. Poindexter*, 142 Wis. 2d 517, 530, 419 N.W.2d 223 (1988), where our supreme court stated that the predecessor statute to WIS. STAT. § 767.56 "does require that the maintenance

award be based upon a consideration of several factors such as the parties' needs and ability to pay." Steven contends that, in this case, the court's oral ruling is devoid of any indication that the court considered his ability to pay $550 per month in maintenance to Amity. Steven further asserts that the court's determination that his income is equal to his reported expenses is inconsistent with a conclusion that he has the ability to pay maintenance in any amount.

¶34 Steven is correct that the circuit court did not expressly address his ability to pay $550 per month in maintenance. We may search the record, however, to determine whether it supports the court's discretionary decision in that regard. *See **Randall***, 235 Wis. 2d 1, ¶7. Based upon our review of the record, we conclude the court could reasonably determine that Steven had the ability to pay monthly maintenance of $550.

¶35 In particular, we note that although the circuit court estimated Steven's income based on the amount of the expenses that he reported on his financial disclosure statement, the court emphasized that Steven's business paid some of his personal expenses and that Steven was then able to deduct those expenses on his taxes. In addition, while the court estimated Steven's hourly rate at $22, based on the amount of his reported expenses, the court noted that "for a tradesman of [Steven's] experience," an hourly rate of $30 "or more" would not be unreasonable. Under these circumstances, the court could reasonably conclude that despite the amount of Steven's reported expenses, he had the ability to pay $550 per month in maintenance.

¶36 In addition, when deciding whether to award Amity maintenance and in what amount, the circuit court had to weigh Steven's ability to pay against the fairness objective of maintenance. *See **LaRocque v. LaRocque***, 139 Wis. 2d

23, 33, 406 N.W.2d 736 (1987). The fairness objective recognizes that one of the goals of a maintenance award is "to ensure a fair and equitable financial arrangement between the parties in each individual case." *Id.* Here, the court could reasonably conclude that if it did not award Amity maintenance, she would be in a worse position financially than Steven, which would be contrary to the fairness objective of maintenance. The court could further reasonably conclude that if Amity had a need for $550 per month in maintenance, it would be fair to order Steven to pay that amount for the limited period of five years, even if doing so required Steven to reduce his own expenses. For these reasons, we reject Steven's argument that we must reverse the maintenance award because the court failed to consider his ability to pay.

### E. Amity's need for maintenance

¶37 Steven also argues that the circuit court erred by awarding Amity $550 per month in maintenance for a period of five years without considering her need for maintenance in that amount. *See Jasper v. Jasper*, 107 Wis. 2d 59, 70, 318 N.W.2d 792 (1982) (stating that a maintenance award "is based upon the needs and income producing abilities of the parties, with consideration of other supplementary factors"). Steven asserts that the court "made no reference to Amity's claimed or anticipated monthly expenses, made no finding as to what amount she needed to meet those monthly expenses and made no finding relative to any contributions made from her cohabitation arrangement to those monthly expenses."

¶38 We conclude that the circuit court's oral ruling, when read as a whole, adequately addressed Amity's need for maintenance. First, the court emphasized that the parties had a long-term marriage. Given the length of the

marriage, the court sought to equalize the parties' income, at least for a limited period of five years. In a case involving a long-term marriage, "it is reasonable to consider an equal division of total income as a starting point in determining maintenance." *LaRocque*, 139 Wis. 2d at 39.

¶39 Second, the circuit court noted that Steven was "a self-employed tradesman with years and years of experience in the trade." In contrast, the court observed that Amity had been "a stay-at-home mom for a period of time" and was otherwise employed "sporadically" throughout the marriage, working "different type[s] of jobs, mostly minimum wage jobs, nothing at a skilled level." The court also emphasized that, because of the nature of Steven's business, he was able to "utilize deductions for expenses that he's incurred that are related to his personal life," while Amity "won't be able to deduct from any particular business that she has." The court stated that Steven's ability to take those deductions was a benefit to him, which the court needed to consider in its maintenance analysis.

¶40 Third, the circuit court found that Steven was the "main breadwinner" during the parties' marriage. The court observed that Steven had paid the majority of Amity's expenses of daily living during the marriage and that, going forward, Amity would "have to fund all of that herself."

¶41 Fourth, the circuit court noted that although the parties' lifestyle during the marriage was not "so extravagant or exorbitant," they "obviously led a pretty decent life." The court found that absent maintenance, Amity would not "be able to achieve the same lifestyle where maybe she could go on a vacation each year and have a place, a roof over her head, a decent car to drive, and other things in her home." Nevertheless, the court concluded that after "some length of time" Amity would be capable of becoming self-supporting at the same standard

of living that she had enjoyed during the marriage. The court rejected Amity's argument that it would take her nine years to achieve that result and instead determined that it was appropriate to award Amity maintenance for a period of five years.

¶42    Thus, the circuit court clearly concluded that Amity had a need for maintenance. While the court did not specifically address the amount of Amity's expenses, we note that Amity's financial disclosure statement reflected monthly expenses of $2,484.57. The court determined that Amity's monthly income was $2,236. Given these facts, the court could reasonably conclude that Amity needed maintenance simply to cover her expenses—not to mention becoming self-supporting at the same lifestyle that she had enjoyed during the marriage. Under these circumstances, the court's decision to award Amity $550 in monthly maintenance for a period of five years was not an erroneous exercise of discretion.

## II. Property division

### A. Valuation of personal property

¶43    Steven next argues that the circuit court erred when dividing the parties' property because the court awarded certain items to Steven in the property division at their purchase prices, rather than at their fair market values. At the contested divorce hearing, Steven testified that during the marriage, he had used inherited funds to purchase a Can-Am UTV, a refrigerator, a washing machine, a stove, a microwave, a sofa and loveseat, and a mattress set. Because Steven had purchased those items using inherited funds, he asked the court to exclude them from the property division. He submitted Exhibit 28, a handwritten list showing what he had allegedly paid for each of the items. He also submitted a printout from Kelley Blue Book's website showing the trade-in value of the Can-Am UTV.

18

¶44     The circuit court concluded that Steven had transmuted his inherited funds to marital property when he used those funds to "purchase property for the [parties'] mutual enjoyment and use during the marriage." The court therefore concluded that the items in question were "marital assets," and it included them in the property division. The court awarded the Can-Am UTV to Steven at its Kelley Blue Book value, and it awarded the remaining items to Steven at the purchase prices listed on Exhibit 28.

¶45     Steven contends that the circuit court erred because "fair market value is the proper method of valuing property for purposes of divorce." *See Corliss v. Corliss*, 107 Wis. 2d 338, 345, 320 N.W.2d 219 (Ct. App. 1982). Be that as it may, Steven failed to provide any evidence of the fair market values of any of the disputed items, except for the Can-Am UTV. The court awarded the Can-Am UTV to Steven at its fair market value, but it had no way of determining the fair market values of the other items. Under these circumstances, the court reasonably determined the values of those items using the only evidence available to it—namely, Steven's evidence of what he had paid to purchase the items. Having failed to present evidence of the fair market values of any items other than the Can-Am UTV, Steven cannot now argue that the court erroneously exercised its discretion by awarding those items to him at their purchase prices, rather than at their fair market values.

### B. Valuation of Steven's premarital interest in real estate

¶46     Finally, Steven argues that the circuit court erred when assigning a value to his premarital interest in the twenty-acre parcel of land where the parties' residence is located. It is undisputed that Steven owned the land before the parties' marriage and that the land was not subject to a mortgage at that time.

Steven testified that he and his previous wife had purchased the land for $13,000 in 1994. Steven and Amity built a home on the property in 2004, two years after their marriage, taking out a mortgage to pay for the home's construction. At the contested divorce hearing, Amity conceded that Steven should receive a credit in the property division for the value of the land that he brought to the marriage.

¶47 Both parties had the real estate appraised. Amity's appraiser, Timothy Williamson, valued the entire property—the land and the improvements—at $350,000. Williamson valued the land alone at $60,000. Steven's appraiser, Christopher Drost, valued the entire property at $316,000 and valued the land alone at $50,000.

¶48 During its oral ruling, the circuit court mistakenly stated that there was "about a $17,000 difference in terms of the value assigned to this property." The actual difference between the appraisers' valuations of the property was $34,000. The court then stated that it had "no idea what to make" of the appraisers' valuations of the land alone. The court explained:

> Mr. Williams[on] at least in his report indicated that it was based on a certain value per acre that he assigned to the land value. But, again, that's land value in 2021 not land value in 1994 when this land was purchased and before it was even developed. And so I have no idea what the value of the land was at that.
>
> And I really don't think either of these appraisals gives me any guidance in terms of assessing value to the land at this point. And, frankly, I agree with [Amity's counsel] that it's not the value of the land today that the Court has to take into consideration in terms of determining premarital value for [Steven]. I'd need to know what the premarital value was by looking at what was the purchase price when this land was purchased back in 1994.
>
> That might have been helpful information, but it's not on the deed. I did look to see if there was any documentation

about what was this land purchased for? What was it assessed at in 1996? Or even what it was assessed … when they built the house. I would think that the, you know, even the property tax records might have shown that. It would have given us some idea of what the value of that land was before the marriage and before the land was further developed.

Notably, the court did not acknowledge Steven's testimony that the purchase price of the land was $13,000 in 1994.

¶49 The circuit court continued its discussion of the land value by stating:

At this point I really don't have any information about what the value—what the premarital value of that land was. Now that house has been on that land since 200[4], that's the marital home has been on that land. It's developed. It's now developed property. Maybe not all 20 acres of it, but a portion of it. That certainly increases the value. And I have no idea what portion of the land in and of itself, you know, just vacant land what the value of that is.

I mean, the land value took into—by both appraisers—took into account all 20 acres, not just the vacant land, but all 20 acres which clearly encompass the house and outbuildings. So I really don't have any evidence here for me to determine what a premarital value is of that land. I just—I have no way of determining that.

¶50 The circuit court subsequently concluded that Steven "essentially converted [the land] into marital property by developing this land and not taking any action … to maintain its character as premarital property." The court later reiterated—again, incorrectly—that the parties' appraisals were "about $17,000 apart." The court then stated:

So what I'm going to do is simply assign a value of $17,000 to [Steven] for the premarital land. And then I will assess—so assessing a total value of the property of $350,000, but giving [Steven] a credit of $17,000 for the land, premarital. That does not get included in the value.

21

> So, essentially, the value that I'm going to start with
> is … $316,000.

In other words, the court stated that it would award the real estate to Steven in the property division at a value of $316,000.

¶51 Amity's attorney then pointed out that $350,000 minus $17,000 is actually $333,000, not $316,000. The court then clarified that it was awarding the real estate to Steven at a value of $333,000, with "$17,000 of credit to" him for the premarital value of the land. The court further stated: "So I want to make that clear. I'm valuing the property at $350,000, giving [Steven] the credit for $17,000, which makes it $333,000. Which is $316,000 plus $17,000…. So the value of the property is $333,000."

¶52 We conclude, for three reasons, that the circuit court erroneously exercised its discretion when determining the value of Steven's premarital interest in the land that he brought to the marriage. First, the court's decision was based on a mistake of fact. The court repeatedly stated that the difference between the appraisers' valuations was $17,000, rather than $34,000. It is clear that the court relied on this mistaken belief when determining the credit that Steven should receive for his premarital interest in the land.

¶53 Second, even if the circuit court had correctly stated that the difference between the appraisers' valuations was $34,000, there is no apparent connection between that difference and the value of Steven's premarital interest in the land. Williamson valued the land alone at $60,000, while Drost valued the land alone at $50,000. The difference between their valuations of the land was therefore $10,000. The court was clearly concerned that the appraisers' valuations of the land did not accurately reflect its value at the time of purchase in 1994.

However, there is nothing in the record to explain why the court believed that the difference between the appraisers' valuations of the entire property—both the land and the improvements—was an accurate representation of Steven's premarital interest in the land alone.

¶54 Third, the circuit court incorrectly stated that there was no evidence regarding the purchase price of the land in 1994. As noted above, Steven testified that he and his former wife had purchased the land for $13,000. The court acknowledged that the property's purchase price in 1994 would have been relevant to determining the value of Steven's premarital interest in the property, but it apparently overlooked Steven's testimony regarding the purchase price.

¶55 For these reasons, we conclude that the circuit court erroneously exercised its discretion when it assigned a value of $17,000 to Steven's premarital interest in the parties' real estate. The court's decision on that issue was based on a mistake of fact, and the record does not show that the court used a demonstrated rational process to reach its decision. *See **LeMere***, 262 Wis. 2d 426, ¶13. We therefore reverse that portion of the court's judgment relating to the division of the parties' property. We remand for the court to reconsider the value of Steven's premarital interest in the real estate and to adjust its division of the parties' property accordingly.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5.